## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ROCKY MOUNTAIN HEALTH MAINTENANCE ORGANIZATION, INC. d/b/a ROCKY MOUNTAIN HEALTH PLANS 2775 Crossroads Boulevard Grand Junction, CO  81506 <br><br> Plaintiff, <br><br> v. <br><br> ALEX M. AZAR, II, Secretary United States Department of Health and Human Services, 200 Independence Avenue, S.W. Washington, DC  20201 <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE
## RELIEF AND SUMS DUE UNDER THE MEDICARE ACT

## INTRODUCTION

1.      This is a dispute concerning the amount of Medicare reimbursement owed to a health maintenance organization ("HMO") for services furnished to Medicare program beneficiaries in fiscal years 2010 and 2011.

2.      The payment dispute in this case is the same dispute at issue for plaintiff's earlier fiscal years 2006 through 2009 in another case pending before this Court, *Rocky Mountain Health Maintenance Organization, Inc. v. Azar*, 17-cv-00242-APM.

3.      This action concerns a 2014 determination by defendant's agency to retroactively claw back approximately $4.5 million in Medicare program reimbursement for the costs of

services rendered by plaintiff, Rocky Mountain Health Maintenance Organization, Inc. ("Rocky Mountain) in its 2010 and 2011 fiscal years.

4.      In September 2017, two agency hearing officers reversed the agency's 2014 determination for Rocky Mountain's 2010 and 2011 fiscal years on the ground that it violates the plain language of the applicable regulation.   In December 2017, Rocky Mountain sent defendant's agency a letter demanding payment of the amount due Rocky Mountain under the hearing officers' final and binding ruling.  The agency did not respond to that demand.  Instead, nine months after the hearing officers ruled, in June 2018, a Deputy Administrator of the  agency issued an ultra vires and untimely decision purporting to reverse the hearing officers' ruling for Rocky Mountain.

5.      In another Medicare reimbursement case, the Tenth Circuit recently issued an opinion that is apropos here.  *Caring Hearts Pers. Home Servs. v. Burwell*, 824 F.3d 968 (10th Cir. 2016).  In that case, Judge Gorsuch wrote for a unanimous court:  "This case has taken us to a strange world where the government itself—the very 'expert' agency responsible for promulgating the 'law' no less—seems unable to keep pace with its own frenetic lawmaking. . . . But whatever else one might say about our visit to this place, one thing seems to us certain:  an agency decision that loses track of its own controlling regulations and applies the wrong rules in order to penalize private citizens can never stand."  *Id*. at 976-77.

6.      The situation here is the same.  After changing its regulation in 1985, the defendant required Rocky Mountain to change its cost apportionment methodology and statistics for all fiscal years after 1985; it reviewed and approved Rocky Mountain's proposed new method and statistics for fiscal years back to 1986; and, it audited and accepted Rocky Mountain's resulting cost apportionment calculations and the supporting statistics for 20 consecutive fiscal

years from 1986 through 2005. Rocky Mountain had no reason in the world to suspect that its approved apportionment method and statistics were unacceptable to the agency until 2013, when agency staff first made a determination to revise Rocky Mountain's apportionment statistics, changed its cost reporting manual, and recouped Medicare program reimbursement paid to Rocky Mountain for fiscal years 2006 through 2009.

7.      Defendant's determinations for the 2010 and 2011 fiscal years at issue in this case are the same as its determinations for Rocky Mountain's earlier fiscal years 2006 through 2009. The agency's own hearing officers concluded that all those of determinations are inconsistent with the plain language and intent of the controlling regulation in effect for the periods at issue.

8.      Further, Rocky Mountain indisputably had no notice, and certainly not with the ascertainable certainty that due process requires, that its agency-approved apportionment method and statistics, which had been reviewed and accepted for 20 years, were not acceptable. *See Gen. Elec. Co. v. U.S. Envtl. Prot. Agency*, 53 F.3d 1324, 1329 (D.C. Cir. 1995); *Loma Linda Univ. Med. Ctr. v. Sebelius*, 408 Fed. Appx. 383 (D.C. Cir. Dec. 2, 2010) (*per curiam*), *aff'g* 684 F. Supp. 2d 42 (D.D.C. 2010). Rocky Mountain reasonably relied on the rules that were in effect at that time, and the agency's prior established approval and acceptance of its apportionment method and statistics, in setting its premiums and budgeting expenditures for the fiscal years at issue. Rocky Mountain cannot go back now to collect additional premiums for the past years at issue or somehow undo expenditures it incurred in those past years.

9.      Moreover, the costs apportioned to the Medicare program through the application of Rocky Mountain's previously approved method and statistics are manifestly reasonable. The objective record evidence—all of it undisputed—shows that the amounts apportioned to Medicare, through the application of Rocky Mountain's approved method and statistics, were

conservative and amounted to tens of millions of dollars less than the amounts that Medicare otherwise would have paid for the same services under its traditional fee-for-service program or under the alternative managed care program established under other provisions of the statute.

10.     In addition to these fatal substantive flaws, the Deputy Administrator's decision is ultra vires and otherwise procedurally invalid.  Defendant's regulations provide that the hearing officers' ruling in this case is final and binding on the parties.  Even if the rules provide for any further agency review of that decision, such review had to be completed within 60 days of the hearing officers' decision.  As this Court has recognized already, that 60-day review period is "critical," *Rocky Mountain Health Maintenance Organization, Inc. v. Azar*, 17-cv-00242-APM, ECF No. 22 at 15.

11.     Rocky Mountain, therefore, requests an order enforcing the decision of the agency hearing officers in this case, declaring invalid and setting aside the decision by the Deputy Administrator purporting to reverse their decision, and requiring the defendant to reimburse Rocky Mountain for the additional amounts due as a result of the correction required by the hearing officers' decision, plus applicable interest on the underpayment amounts identified in that decision.

## JURISDICTION AND VENUE

12.     This action arises under title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*.

13.     Jurisdiction is proper under 28 U.S.C. § 1331, 28 U.S.C. § 1361, and 42 U.S.C. § 1395oo(f)(1).

14.     Venue is proper in this judicial district under 28 U.S.C. § 1391 and 42 U.S.C. § 1395oo(f)(1).

## PARTIES

15.     Plaintiff, Rocky Mountain Health Maintenance Organization, Inc., doing business as Rocky Mountain Health Plans, is an HMO that operates in Colorado, with its principal place of business at 2775 Crossroads Boulevard, Grand Junction, Colorado.   Rocky Mountain participates in the Medicare program as a cost-reimbursed HMO.   Its Medicare program identification number is H-0602.

16.     Defendant, Alex M. Azar, II, is sued only in his official capacity as Secretary of the United States Department of Health and Human Services, the federal agency that administers the Medicare program.  References in this Complaint to the Secretary are meant to refer to him, his subordinate agencies and officials, and to his official predecessors or successors as the context requires.

17.     The Centers for Medicare & Medicaid Services ("CMS") is a component of the Secretary's agency with responsibility for day-to-day operation and administration of the Medicare program.   References in this Complaint to CMS are meant to refer to CMS and its predecessors, including the Health Care Financing Administration, as the context requires.

## REGULATORY BACKGROUND

### The Medicare Program and Cost-Reimbursed HMOs

18.     The Medicare program is established in title XVIII of the Social Security Act. Title XVIII is commonly referred to, including in this Complaint, as the Medicare Act.  Medicare provides health insurance for aged and disabled individuals.  42 U.S.C. §§ 1395 *et seq*.

19.     Part A of the Medicare Act covers inpatient services furnished by hospitals and skilled nursing facilities, homecare services furnished by home health agencies, and hospice care.  *See id.* § 1395d(a).  These organizations are defined in the Medicare Act as "providers of service," and typically referred to in the Medicare regulatory context as "providers."   *Id.* §

1395x(u).  Under Part A, the Medicare program reimburses providers on a fee-for-service basis for covered services furnished to Medicare beneficiaries.  *See id.* § 1395f(a)-(b); *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 205 (D.C. Cir. 2011).  The Secretary contracts with private organizations, which are now called "Medicare Administrative Contractors" and were formerly called "fiscal intermediaries," to process institutional claims for payment by providers.  *See* 42 U.S.C. §§ 1395h, 1395kk-1.

20.     Part B of the Medicare Act covers "medical and other health services," including physicians' services and supplies furnished incident to physicians' services (among other things). *Id.* §§ 1395k(a)(2)(B), 1395x(s).  Under Part B, Medicare reimburses physicians and suppliers on a fee-for-service basis for covered items and services furnished to Medicare beneficiaries.  *See id.* § 1395*l*; *Am. Soc'y of Cataract & Refractive Surgery v. Thompson*, 279 F.3d 447 (7th Cir. 2002).  Claims for Part B payment for services provided by physicians and suppliers are processed by Medicare Administrative Contractors generally referred to as "carriers."  *See* 42 U.S.C. § 1395u.

21.     Section 1876 of the Social Security Act authorizes the Secretary to contract with HMOs to provide covered services to Medicare beneficiaries either directly or through contractual arrangements with providers, physicians and suppliers.  *See id.* § 1395mm.  The managed care program established under section 1876 is an alternative to the original Medicare fee-for-service program under Parts A and B of the Medicare Act.  *See id.*  Under section 1876, the Secretary reimburses some HMOs on a risk basis and some HMOs, including Rocky Mountain, on a cost basis, as discussed further below.

22.     In 1997, Congress enacted a new Part C of the Medicare Act, establishing what is now called the Medicare Advantage program (formerly "Medicare+Choice").  *See id.* § 1395w-

21.    The Medicare Advantage program supplanted the risk-based managed care program established under section 1876; and, when Congress enacted the Medicare Advantage program, Congress precluded new cost-reimbursed HMOs from participating in the Medicare program under section 1876.   *See id.* § 1395mm(h).   Rocky Mountain is one of the very few (approximately 20) remaining HMOs that continue to participate in the Medicare program as a cost-reimbursed HMO under section 1876.

### *Medicare Cost Reimbursement for HMOs Under Section 1876*

23.    Regulations codified in 42 C.F.R. Part 417 apply to cost-reimbursed HMOs, like Rocky Mountain, that participate in the program under section 1876 of the Medicare Act.

24.    The regulations in Part 417 require an HMO to make available to its Medicare enrollees the Medicare benefits that are covered under the Medicare statute.   42 C.F.R. § 417.414(b).   An HMO may satisfy this obligation by furnishing services to its Medicare enrollees either "directly or through arrangements with others."   *Id*.

25.    Section 1876 of the Medicare Act provides for reimbursement on a reasonable cost basis.   42 U.S.C. § 1395mm(h).   Reasonable cost is defined as the cost actually incurred in the efficient delivery of necessary health services, as determined under regulations specifying the items included and methods used to determine reasonable cost.   *See id.* §§ 1395mm(h)(1), 1395x(v)(1)(A).

26.    A cost-reimbursed HMO may elect to have the Secretary pay hospitals and skilled nursing facilities directly for Medicare Part A covered services furnished to the HMO's Medicare enrollees.   *See id.* § 1395mm(h)(2); 42 C.F.R. §§ 417.532(c), 417.556(d).   Rocky Mountain made this election.   Thus, the issue in this case concerns only the reasonable cost of medical and other health services, covered under Part B of the Medicare Act, that Rocky Mountain arranged to furnish to its Medicare enrollees.

27.     The total amount of Medicare reimbursement owed to a cost-reimbursed HMO is determined on an annual basis, for each fiscal year of the HMO, through the submission of a cost report to CMS, which itself acts as the direct "fiscal intermediary" and issues the initial and final payment determinations for the HMO.  *See* 42 U.S.C. § 1395mm(h)(3)-(4);  42 C.F.R. § 417.576.

28.     CMS reviews and may audit each HMO cost report, then makes a final payment determination through retroactive corrective adjustments reconciling the estimated interim program payments made to the HMO over the course of the fiscal year, *see* 42 C.F.R. §§ 417.532(b), 517.570, with a final determination as to the HMO's total reasonable cost for services rendered in that fiscal year.  *See id.* § 417.576.  *See also Good Samaritan Hosp. v. Shalala*, 508 U.S. 402 (1993) (accepting the Secretary's view that the statutory provision for retroactive corrective adjustments provides only for year-end book balancing adjustments that reconcile interim payments made over the course of a year with the total reasonable cost of services furnished in a fiscal year as determined under applicable regulations).

29.     Costs incurred by an HMO for Medicare Part B covered services that are furnished to HMO enrollees by physicians or other suppliers are reported on the Medicare cost report in a cost pool called the "Physician Groups cost center."

30.     The expenses included in the Physician Groups cost center are not limited to claims payments made by the HMO in the current fiscal year.  The costs reported in Rocky Mountain's Physician Groups cost center, for the periods at issue, include claims processing costs, current and prior year accruals, physician incentive payments and other expenses that are not directly related to claims payments made to physicians and suppliers.

31.     The Physician Groups cost center also receives an allocation of some administrative overhead costs, which are not directly related to any particular service claim,

before the total expenses in the cost pool are apportioned among Medicare and other lines of business conducted by the HMO (like Medicaid and commercial insurance plan enrollees).

### *Apportionment of Part B Medical Service Costs*

32.    For fiscal years beginning before 1986, Rocky Mountain apportioned medical service costs among Medicare enrollees and the HMO's other lines of business (Medicaid and commercial enrollees) using a paid-claims method, in accordance with the Medicare regulation then in effect.  42 C.F.R. § 405.2043(c)(2)(ii) (1984).  Under that method, Medicare's share of an HMO's cost was determined on the basis of the charges paid by the HMO "pursuant to the terms of the agreement[s]" between the HMO and physicians and suppliers "for these covered services."  *Id.*

33.    In 1985, the Secretary adopted a new apportionment regulation codified at 42 C.F.R. § 417.560.  *See* 50 Fed. Reg. 1,314, 1,346 (Jan. 10, 1985).  The agency was concerned then that the paid-claims method of apportionment was susceptible to gaming by some HMOs (not Rocky Mountain) that would agree to pay physicians or suppliers more for a given service furnished to Medicare enrollees in the HMO (cost-reimbursed by the Medicare program) and less for the same service furnished to other HMO enrollees (not cost-reimbursed by Medicare).

34.    The apportionment regulation in section 417.560 applies to fiscal years beginning after 1985, including the fiscal years at issue.  Section 417.560 provides for the apportionment of cost based on service statistics that measure the utilization of services by Medicare enrollees as a percentage of the total covered services furnished to all HMO enrollees, without regard to differing amounts paid by the HMO for these services.  The specific provision of the regulation applicable to Rocky Mountain provides that the HMO's cost is apportioned to Medicare based on "the ratio of charges for covered services furnished to Medicare enrollees to the total charges for all such services."  42 C.F.R. § 417.560(c).

35.     Section 417.560 uses a physician's or supplier's standard "charges" for a covered service as the default statistic for apportionment, but HMOs may use alternative service statistics with CMS's approval, as in this case. *See id.* § 417.566.

36.     Service statistics assign an equal weight to a given medical service provided to an HMO enrollee (Medicare and non-Medicare enrollees alike) by a physician or supplier without regard to the amount actually paid by the HMO.  Medicare HMO cost report instructions and audit requirements expressly recognize that service statistics are intended to serve as a proxy measure of utilization of all services furnished by the HMO.  They specifically measure the volume of Medicare-covered services used by Medicare enrollees as a percentage of the total services used by all enrollees of an HMO.

37.     CMS cost report instructions, in the administrative record for this case, direct an HMO to measure its "total number of service statistics used by Medicare enrollees" as a percentage of its "total service statistics."  The instructions make clear that the total service statistics must include "all of the services used" by all HMO enrollees, "whether or not the plan has been billed by the supplier due to timing delays," and must include services that are not paid for by the HMO.

38.     CMS cost report instructions also provide that the Medicare service statistics should include all services "covered by the Medicare program" and for which Medicare has primary liability.

39.     CMS has "Agreed Upon Procedures" for audits of HMO cost reports, which are also included in the administrative record for this case.  Those audit requirements are meant to ensure that "the apportionment of allowable costs related to physician and other Part B services

between Medicare and non-Medicare enrollees is equitable" and that the costs apportioned to Medicare represent services that are "covered" by Medicare.

40.     CMS's audit requirements define apportionment as "the process of determining the percentage/utilization ratio of covered medical services incurred by the enrolled Medicare beneficiaries to the total covered medical services incurred by the Plan."

41.     CMS's audit requirements define covered charges as the charges for "services or benefits for which the charge is eligible towards satisfying a patient deductible or out of pocket maximum and/or results in the health plan making either partial or full payment."

42.     In August 2013, after the period at issue, CMS revised its cost report instructions to state that the Medicare service statistics used to apportion HMO costs "should exclude any claims processed by MACs [Medicare Administrative Contractors], Carriers, and Intermediaries." In an accompanying electronic transmittal, CMS advised that the revised cost report forms should be used "beginning with the 2014 Budget Forecast."

## FACTS SPECIFIC TO THIS CASE

### Rocky Mountain

43.     Rocky Mountain is an HMO that arranges for the provision of medically necessary health care services to enrollees in Colorado. Rocky Mountain offers plans for both commercial enrollees (individuals and groups) and for beneficiaries of the Medicare and Medicaid programs, as well as the Children's Health Insurance Program in Colorado.

44.      Rocky Mountain has participated in the Medicare program as a cost-reimbursed HMO since 1977. During the periods at issue, nearly one-third of Rocky Mountain's enrollees were Medicare beneficiaries; half of its enrollees were commercial plan members, and the rest of its enrollees were in Colorado Medicaid (including the Children's Health Insurance Program).

***Rocky Mountain's Contractual Arrangements with Physicians and Suppliers***

45.     Rocky Mountain provides medical and other health services to its Medicare, commercial, and State Medicaid program enrollees through contractual arrangements with physicians and suppliers.  Those contractual arrangements provide for payment by Rocky Mountain on a fee-for-service basis, pursuant to contractual fee schedules.  The contractual fee schedules provide for different payment amounts for services provided in different geographic service areas, for services provided by different physician groups or suppliers within a given geographic service area, and for services used by different HMO enrollee groups (Medicare, commercial, and Medicaid).

46.     Since 2008, Rocky Mountain's agreements with physicians and suppliers have provided for payment of relatively smaller amounts for a given service when furnished to a Medicaid enrollee in the HMO as opposed to a Medicare or commercial enrollee.  The reason for this variance is that Colorado Medicaid pays Rocky Mountain very low amounts for services furnished to Medicaid participants.  Rocky Mountain provides services to Medicaid participants at a loss (it pays physicians and suppliers more than the State reimburses Rocky Mountain for these services), and it defrays a portion of that loss by paying relatively lower amounts than it would otherwise pay to physicians and suppliers for covered services furnished to non-Medicaid enrollees of the HMO.

***Enrollees' Financial Responsibilities***

47.     Rocky Mountain's Medicare, commercial, and Medicaid members have different financial responsibilities under Rocky Mountain's health plans.  Medicaid members do not pay a premium to Rocky Mountain and are not liable for coinsurance amounts.  Medicare beneficiaries and commercial members do pay premiums to Rocky Mountain and are financially responsible for cost-sharing amounts (copayments, coinsurance, and deductibles).

48.     Under the Medicare Part B fee-for-service program, Medicare beneficiaries are responsible for an annual deductible and a 20% coinsurance amount for most covered medical and other health services.   *See* 42 U.S.C. § 1395*l*(a)-(b); 42 C.F.R. § 410.152(b).   Medicare HMOs, like Rocky Mountain, offer Medicare beneficiaries reduced coinsurance obligations that are covered, in part, by a premium paid to the HMO by the individual.

49.     Rocky Mountain's commercial members also pay premiums and have cost sharing responsibilities, including annual deductible amounts.   Rocky Mountain's commercial plans include annual deductible amounts ranging from $500 to more than $6,000 per year.   It is common for Rocky Mountain to make no payment to a physician or supplier for covered medical services furnished to a commercial member of the HMO because the allowable charges for the service are applied entirely toward satisfaction of the member's annual deductible.   But in these cases, the covered services are included in the total service statistics that are used to apportion Rocky Mountain's costs on the Medicare cost report, as required under the Medicare apportionment regulation and related cost report instructions.

### *Claims Processing by Rocky Mountain*

50.     When Rocky Mountain receives a bill for services furnished to an HMO enrollee by a physician or supplier, it makes a coverage determination and calculates the allowable amount for the services, if covered, based on its contractual fee schedule with the physician or supplier.

51.     The amount that Rocky Mountain pays on the claim is not necessarily the physician's or supplier's standard charges for the items or services furnished to the patient.   The allowable amount paid by Rocky Mountain is the contractually allowed amount less any payment made by another payer with primary payment liability and less any amount that is the member's responsibility under Rocky Mountain's health plan, including the annual deductible.

Rocky Mountain maintains records of all these amounts—billed amounts, allowed amounts, paid amounts, and amounts paid by another party—in its claims database.

### Claims Processed by Medicare Part B Carriers

52.     CMS has been aware for decades that physicians and suppliers sometimes bill the Medicare Part B carriers for covered services furnished to a Medicare beneficiary who has enrolled in a Medicare HMO.

53.     When a physician bills a Medicare Part B carrier for services furnished to an enrollee in Rocky Mountain's plan, Rocky Mountain makes a residual payment on the claim to reflect the Medicare allowable amount for the items or services, the amount paid by the Part B carrier, and the amount of the member's financial responsibility under Rocky Mountain's plan. These amounts are all recorded in Rocky Mountain's claims database.

54.     Similarly, when another payer, other than a Medicare Part B carrier, makes payment on a claim for an item or service furnished to a Medicare, commercial, or Medicaid enrollee in Rocky Mountain's plan, Rocky Mountain may make a residual payment based on the difference, if any, between the contractually allowed amount for that service and the amount paid by the other payer.

### Rocky Mountain's Cost Apportionment Statistics

55.     Rocky Mountain apportions costs in its Physician Groups cost center, on the Medicare cost report, using claims data recorded in its claims database, in accord with Medicare regulations requiring cost-reimbursed HMOs to maintain financial records and statistical data needed to determine the reasonable cost of services furnished to Medicare enrollees.  *See* 42 C.F.R. § 417.568.

56.     For fiscal years before 1986, Rocky Mountain used a paid-claims method to apportion the expenses reported in the Physician Groups cost center.  In accordance with the

Case 1:18-cv-01864-APM   Document 1   Filed 08/08/18   Page 15 of 34


Medicare regulation in effect then, the paid-claims method apportioned Rocky Mountain's costs based on the payments actually made to network physicians and suppliers by Rocky Mountain pursuant to the terms of its agreements with them.

57.     In the early 1990s, the Secretary's agency notified Rocky Mountain that the paid-claims method was not permissible for fiscal years after 1985 and directed Rocky Mountain to develop a different apportionment method using service statistics to apportion medical service costs for all cost years after 1985.  This determination reflected agency policy and the rule change prohibiting apportionment based on a paid-claims method for fiscal years after 1985.

58.     When the Secretary's agency notified Rocky Mountain that it could not continue using a paid-claims method for apportionment, the agency also recommended that Rocky Mountain use a common fee schedule for apportionment of its medical service costs.

59.     Upon receipt of CMS's notification, Rocky Mountain worked with a consultant, a certified public accountant who was very well-experienced with preparation and audits of Medicare HMO cost reports, to develop new service statistics for the apportionment of costs incurred by Rocky Mountain for all fiscal years after 1985.

60.     Rocky Mountain and its consultant worked closely with the Secretary's agency over an extended period, with several telephone calls and at least one in-person meeting, to develop its new apportionment method and the service statistics used under that method.  The new service statistics reflected the application of common fee schedule amounts, which do not vary based on differing amounts paid by Rocky Mountain, for all covered physician services and supplies used by all enrollees (Medicare, commercial, and Medicaid) in Rocky Mountain's plans.

61.     At the conclusion of the process, in 1995, Rocky Mountain provided CMS with a detailed, written memorandum explaining the development and basis for the new service

statistics that Rocky Mountain proposed to use for the apportionment of costs for fiscal years from 1986 forward.  The 1995 memorandum explained the development of the new service statistics step by step, explicitly stating that service statistics would reflect the re-priced common fee schedule amounts for all covered physician and supplier services recorded in Rocky Mountain's claims database, excluding non-allowable services.

### *The Agency's Acceptance of Rocky Mountain's Apportionment Method and Statistics for 20 Consecutive Years*

62.     The Secretary's agency approved the new apportionment method and statistics described in Rocky Mountain's 1995 memorandum and thereafter audited and accepted them for all fiscal years from 1986 through 2005.

63.     Those statistics included all covered services used by Rocky Mountain enrollees, including some non-Medicare services for which Rocky Mountain made no payment (due to commercial enrollee deductible, for example) and some Medicare claims on which Rocky Mountain made only a residual payment after the claim was billed to and processed by a Medicare Part B carrier.  The statistics were audited or otherwise reviewed numerous times and consistently accepted for every fiscal year from 1986 through 2005.

64.     Rocky Mountain's cost reports for those fiscal years were subjected to numerous reviews by or on behalf of the Secretary's agency.  Review of the service statistics used in the cost apportionment calculation is one of the two essential and "critical" elements of any HMO cost report audit or review, but none of those audits or reviews raised any concern with the service statistics that Rocky Mountain used to apportion its costs.

65.     In 1995, the Secretary's agency conducted an "Onsite Performance Review" of Rocky Mountain and concluded in a written report that Rocky Mountain's cost report provides "*adequate cost and statistical data . . .* that can be verified by qualified auditors" and is "based

on an approved method of cost finding."  The agency affirmed Rocky Mountain's service statistics, including the covered services that were billed to and processed by a Medicare Part B carrier from the service statistics used for apportionment.

66.     Price Waterhouse Coopers conducted a full scope audit of Rocky Mountain's Medicare cost report for its 1996 cost year, on behalf of the Secretary, and affirmed the service statistics that Rocky Mountain used for apportionment.

67.     The Secretary's Office of Inspector General reviewed Rocky Mountain's 1998 cost report with a specific focus on whether Rocky Mountain was adequately accounting for claims that were paid by a Medicare Part B carrier for services furnished to Rocky Mountain's Medicare enrollees.  In its 2002 report on its review, the Office of Inspector General determined that Rocky Mountain's claimed costs and statistics were appropriate, and affirmed the service statistics used for apportionment.

68.     Rocky Mountain's 1999 cost report was subjected to a full-scope audit by Computer Sciences Corporation/American Express Tax and Business Services, acting as a Medicare program integrity contractor.  The American Express auditors affirmed the service statistics that Rocky Mountain used for apportionment of the Physician Groups cost center.

69.     In 2006, CMS's contract auditors initiated an on-site, full-scope audit of Rocky Mountain's Medicare cost reports for its 2000 through 2005 fiscal years.  The auditors specifically requested and were given access to Rocky Mountain's electronic files supporting its apportionment statistics and the methods used to develop the apportionment statistics.  The auditors also requested and were allowed direct access to the claims data that Rocky Mountain used to compile the service statistics for apportionment, detailed information about the common fee schedule and re-pricing files used to compile Rocky Mountain's service statistics, and the

definitions of codes used in the claims database, including coordination-of-benefit codes indicating, among other things, when a claim was processed initially by a Medicare Part B carrier.

70.     In connection with the audit for fiscal years 2000 through 2005, the agency's contract auditors specifically requested and reviewed a sample of 280 Medicare claims from four of the six fiscal years.  The auditors used this sample, which included a significant percentage (14%) of readily-identifiable claims for Medicare-covered services that had been processed by a Medicare Part B carrier, to test and verify Rocky Mountain's Medicare service statistics for apportionment.

71.     In view of the facts that review of the service statistics used for apportionment is a critical element of every cost report review and that CMS's auditors plainly reviewed the claims sample they requested, including a significant proportion of Medicare-covered claims that were processed by a Medicare Part B carrier, their determination to make no adjustment to remove those claims from Rocky Mountain's statistics thus affirmed their inclusion in the service statistics.

### The 2010-2011 Fiscal Years at Issue

72.     Rocky Mountain filed its Medicare cost reports for the 2010 and 2011 fiscal years at issue using the same service statistics for apportionment that it had used for the prior fiscal years back to 1986.

73.     As in the prior years, Rock Mountain's service statistics for the 2010 and 2011 fiscal years included claims for covered services furnished to non-Medicare enrollees for which Rocky Mountain made little or no payment because the claims were applied entirely toward satisfaction of the member's deductible or some other payer made payment on the claim.  The statistics also included common fee schedule amounts for covered services furnished to Medicaid

enrollees for which Rocky Mountain pays relatively lower amounts.  The inclusion of these covered services in the total service statistics used for apportionment tended to dilute Medicare's share of the costs incurred by Rocky Mountain, because Rocky Mountain made little or no payment for these services but all covered services were equally weighted in the service statistics based on the common fee schedule amounts.

74.     The dilutive effects of the inclusion of non-Medicare services for which Rocky Mountain made little or no payment in Rocky Mountain's service statistics were counterbalanced, in part, by Rocky Mountain's consistent inclusion in the service statistics of claims for Medicare-covered services that were initially processed by a Medicare Part B carrier and for which Rocky Mountain then paid the required residual amounts.

75.     Undisputed record evidence shows that Rocky Mountain's Medicare apportionment ratios for the fiscal years at issue were significantly below the norm, reflecting a conservative apportionment of costs to Medicare.  Additional undisputed record evidence, concerning an analysis performed by Milliman, a nationally renowned actuarial firm, also shows that the costs Rocky Mountain apportioned to Medicare on the basis of its service statistics were tens of millions of dollars less than the amount that Medicare would have paid for the same services if they were provided under the Medicare Part B fee-for-service program or if they were furnished under the Medicare Advantage program.

### CMS's Exclusion of Some Medicare-Covered Services from the Service Statistics for Rocky Mountain's 2010 and 2011 Fiscal Years

76.     Notwithstanding the objective, undisputed record evidence of the reasonableness of costs that Rocky Mountain apportioned to Medicare, using its long-established and CMS-approved apportionment method and service statistics, CMS determined in 2014 to exclude some

Medicare-covered services from the service statistics used for apportionment of Rocky Mountain's costs for fiscal years 2010 and 2011.

77.     In its 2014 determination, CMS adjusted Rocky Mountain's service statistics by removing all claims for Medicare-covered services that were processed initially by a Medicare Part B carrier.  That determination retroactively reduced the Medicare apportionment ratio and thus the amount of Medicare program reimbursement due Rocky Mountain by approximately $4.5 million for its 2010 and 2011 fiscal years.

78.     CMS's Division of Capitated Plan Audits issued those final payment determinations in March 2014.  Nobody employed by CMS in that office in 2014 had ever had any direct involvement with the agency's original review and approval of Rocky Mountain's apportionment method and service statistics for all fiscal years after 1985.

79.     The CMS official who made the 2014 payment determinations on behalf of the agency, for Rocky Mountain's 2010 and 2011 fiscal years, had only started working for the Medicare program in 2006.  She admittedly had no knowledge of the agency's rule change, or the rationale for the change, in the 1980s prohibiting the use of the paid-claims method of cost apportionment and openly admits to her preference for cost-reimbursed HMOs to use a paid-claims method of apportionment.

### CMS's Denial of Rocky Mountain's Alternative Claim for A Separate Apportionment Calculation for Medicaid Services

80.     Rocky Mountain timely objected to CMS's proposed adjustments to remove Medicare-covered services from the apportionment statistics and also presented an alternative claim, before the agency issued its final determinations, to segregate the HMO's Medicaid costs and statistics from the Physician Groups cost center and reflect a separate cost apportionment calculation for the costs of the Medicaid services.  At that time, CMS considered this alternative

and rejected it on the ground that the effect would have been to "decrease[] the non-Medicare apportionment statistics, increase[] the apportionment ratios, and generally increase[] Medicare reimbursable costs."

### *The Unreasonably Harsh Effect of CMS's Retroactive Payment Determinations*

81.    The financial impact of CMS's determinations is extraordinarily harsh on Rocky Mountain.  Through those payment determinations for fiscal years 2006 through 2011, CMS retroactively clawed back more than $20 million at a time when Rocky Mountain could not mitigate the loss through an increase in the premiums charged to Medicare beneficiaries and commercial enrollees in those years.

82.    In setting its member premiums for a fiscal year, Rocky Mountain budgets for an expected level of cost and expected level of revenue, including Medicare program reimbursement based on prior agency determinations of the amount of program reimbursement due to Rocky Mountain for earlier fiscal years.  The premiums charged to Rocky Mountain's members are calculated based on the difference between expected cost and expected revenue, including expected Medicare program reimbursement.

83.    Rocky Mountain could have charged larger premiums to its members for the periods at issue if Rocky Mountain had known that the amount of Medicare program reimbursement would be reduced for those periods.  But, Rocky Mountain cannot retroactively increase premiums charged to members for its 2010 and 2011 fiscal years to make up the shortfall caused by CMS's retroactive determination to reduce the amount of Medicare program reimbursement paid to Rocky Mountain for those years.

84.    Rocky Mountain also would have evaluated its budgeted expenditures and capital investments differently for the periods at issue if it had notice then of the dramatic change in Medicare program reimbursement that was brought about by CMS's 2014 determination.

85.     In view of Rocky Mountain's settled expectations and reasonable reliance on the Secretary's prior approval and acceptance of its apportionment method and service statistics, and based on his decades of experience in a managerial position in the Secretary's agency with responsibility for the Medicare cost HMO program, a retired, longtime veteran of the Secretary's agency testified in administrative proceedings in this case that the adjustments to remove certain Medicare-covered services from Rocky Mountain's service statistics should not be applied retroactively to fiscal years before 2013.

### *Administrative Appeal Proceedings*

86.     Rocky Mountain timely appealed CMS's payment determinations for fiscal years 2010 and 2011 to CMS hearing officers employed by the Secretary to adjudicate cost-reimbursement appeals by HMOs.  *See* 42 C.F.R. § 405.1801(b)(2).  The appeal was assigned case number "HMO 2014-3."  The decision in that appeal, which, by stipulation of the parties, is based on the record compiled in Rocky Mountain's appeal for the 2006 through 2009 fiscal years, is the decision at issue here.

87.     Rocky Mountain's appeal was heard by two CMS hearing officers—one is a seasoned attorney with a Masters in Business Administration ("MBA"), and the other has an MBA and decades of experience with Medicare cost reporting and reimbursement.

88.     The CMS hearing officers issued a ruling dated September 13, 2017 that "reaffirm[ed]" their prior ruling in favor of Rocky Mountain on the same payment dispute for its 2006 through 2009 fiscal years and reversed CMS's determinations with the respect to the services statistics used for apportionment for the 2010 and 2011 fiscal year at issue here.  They ruled that CMS's determination to remove Medicare-covered services from the apportionment statistics conflicts with the plain language of the apportionment regulation in 42 C.F.R. § 417.560(c).  The hearing officers' decision (at 3) reasoned that the regulation provides that the

numerator of the apportionment ratio includes all Medicare-covered services, and CMS conceded at the hearing that its cost report instructions and audit requirements "indicate that covered services are included in the statistics and that carrier paid claims are covered services." The hearing officers noted (at 6) that CMS also conceded that "covered" and "total" services are not limited "to those services for which the HMO makes a payment." "Therefore the term covered services . . . includes carrier paid claims."

89.     The CMS hearing officers also concluded that the plain language of the regulation is consistent with indications of the Secretary's intent when the agency adopted section 417.560 in 1985, including the agency's contemporaneous determination that Rocky Mountain could no longer continue to apportion costs based on the paid-claims method that had been used and accepted for fiscal years before 1986.

90.     The CMS hearing officers rejected several other arguments urged by CMS's litigation counsel. Their decision (at 6-7) expressly rejects agency counsel's argument that the apportionment regulation requires symmetry between the costs that are apportioned and the statistics used to apportion those costs. The hearing officers explained (at 7) that the Medicare cost finding process prescribed by the Secretary's reasonable cost reimbursement regulations "often contains a statistical proxy formula" involving the application of a "statistical ratio" representing the Medicare program's share of utilization, and these statistical proxies, by their very nature, are inherently not meant to "achieve an exactly precise measurement." Therefore, there is no expectation that a statistical apportionment ratio will contain the same items and elements that are included in the cost pool it is applied against in the cost finding process.

91.     Soon after the hearing officers issued their decision, the CMS Administrator's Office of the Attorney Advisor issued a notice informing the parties that the Administrator

intended to review their decision and requesting comments by the parties in accordance with the procedures for Administrator review of decisions by the Provider Reimbursement Review Board under 42 U.S.C. § 1395oo and 42 C.F.R. § 405.1875.

92.     Agency counsel for CMS submitted a comment letter dated October 5, 2017 urging the Administrator to reverse the hearing officers' decision, citing 42 C.F.R. § 405.1801(b)(2) and the regulation governing Administrator review of Board hearing decisions in 42 C.F.R. § 405.1875(a).

93.     Rocky Mountain submitted a comment dated October 5, 2017 stating that the hearing officers' ruling "must stand" for the reasons set forth in the comments previously submitted to the Administrator with respect to the hearing officers' ruling in the appeal for Rocky Mountain's fiscal  years 2006 through 2009, which were enclosed and incorporated by reference. Those comments objected, *inter alia*, that the Administrator lacks express authority to review the hearing officers' ruling and that such review (if authorized) must be completed within the 60-day period required under 42 C.F.R. § 405.1875.

94.     The CMS Administrator did not respond to comments, and did not issue a decision on the hearing officers' ruling within the 60-day period described in 42 C.F.R. §§ 405.1871 and 405.1875.

95.     Rocky Mountain sent a letter to the CMS Administrator, dated December 17, 2017, demanding payment due for fiscal years 2010 and 2011 under the hearing officers' September 13, 2017 ruling in Rocky Mountain's favor, which is "final and binding" under 42 C.F.R. § 405.1801(b)(2) and the rules governing a Board hearing in 42 C.F.R. §§ 405.1871(b)(1) and 405.1875(e)(2).

96.     Defendant did not respond to Rocky Mountain's December 17, 2017 demand letter.

97.     On March 22, 2018, this Court issued a remand order in *Rocky Mountain Health Maintenance Organization, Inc. v. Azar*, 17-cv-00242-APM, ECF No. 22, ordering the agency to explain the Administrator's authority and the time period allowed (if any) for Administrator review of the hearing officers' ruling for Rocky Mountain's fiscal years 2006 through 2009.  The Court also required the parties to file a status report updating the court on the remand proceedings not later than June 15, 2018.

98.     On June 13, 2018—more than nine months after the hearing officers' decision and six months after Rocky Mountain's demand for payment—the CMS Administrator's office issued a decision, signed by a Deputy Administrator of CMS on June 11, 2018, purporting to reverse the hearing officers' ruling in Rocky Mountain's favor for fiscal years 2010 and 2011. The Administrator's office issued that decision at the same time as it issued a separate decision in response to this Court's remand order concerning Rocky Mountain's fiscal years 2006 through 2009.

99.     The Deputy Administrator's decision does not meaningfully address the apportionment regulation, 42 C.F.R. § 417.560(c), that is controlling here.  The decision in this case is nearly identical to a decision issued by another Deputy Administrator in Rocky Mountain's earlier appeal on the same issue for its fiscal years 2006 through 2009.  The decision in this case (at 7) asserts that the statistics for apportionment of costs of medical services furnished by physicians "must be related to the costs a plan actually incurs that are being apportioned."  The decision relies principally on an inapposite regulation, 42 C.F.R. § 417.556, that addresses apportionment of a different category of costs of services furnished to HMO

enrollees by "providers" (like hospitals and skilled nursing facilities).  The specific language in section 417.566 that the Deputy Administrator relied upon addresses situations in which an HMO "elects to have providers reimbursed by the . . . Medicare intermediary."  Section 417.556(d) provides that in those cases, the Medicare program cost of the provider (*e.g*, hospital) services furnished to HMO enrollees is "the amount the intermediary paid the provider."  *See* 42 C.F.R. § 417.556(d).

100.    The Deputy Administrator's decision (at 8-9) again adopts arguments advanced by CMS's litigation counsel that Rocky Mountain's service statistics produce "inappropriate cost shifting," "result[] in costs not incurred by the HMO being included in the determination of Medicare's share," and "amount[] to double payment by the Medicare program."  These same arguments were presented to and rejected by the CMS hearing officers and are unsupported by any substantial evidence in the record.  There is no dispute that Rocky Mountain's reported costs include only expenses that were incurred directly by Rocky Mountain.  As CMS admitted at the hearing, no matter how that cost pool is divided, it cannot possibly produce a result in which Rocky Mountain is reimbursed for costs it did not incur.

101.    With respect to Rocky Mountain's argument that it lacked fair notice of the agency's current position, the Deputy merely stated (at 12, n. 14) that the record does not support a claim that CMS "explicitly accepted" Rocky Mountain's apportionment method "or any claim of reliance for any alleged payment for costs that the HMO knew were not incurred by the HMO."  This conclusion wrongly assumes that "explicit" acceptance by CMS is required or even relevant.  There is no requirement that each and every element of a cost report be accepted, "*explicitly.*"  CMS's explicit acceptance of Rocky Mountain's service statistics was not required to engender Rocky Mountain's reasonable reliance over the course of 20 cost years following the

agency's mandated change in Rocky Mountain's apportionment method and statistics and its approval of Rocky Mountain's apportionment method back to 1985.

102.    The Deputy Administrator's decision does not address any other argument or evidence presented by Rocky Mountain in the hearing before the CMS hearing officers, except insofar as it purports to "incorporate" the decision on remand with respect to Rocky Mountain's fiscal years 2006 through 2009.

## COUNT I

103.    Plaintiff repeats the allegations in paragraphs 1 through 102 of this Complaint as if fully set forth herein.

104.    This Court may enforce or review the final agency decision in this case under the applicable provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1)-(2), and 28 U.S.C. § 1361.

105.    This Court has authority to review the procedural validity of the Deputy Administrator's decision in this case, and if the Court concludes that the Deputy Administrator's decision is procedurally invalid, the Court may grant declaratory, injunctive, or other relief in the nature of mandamus compelling Secretary to perform a nondiscretionary duty to reimburse Rocky Mountain for the additional amounts due under the hearing officers' ruling in this case. *See* 42 U.S.C. § 706(1); *id.* § 706(2)(D); 28 U.S.C. § 1361.   *See also In re Medicare Reimbursement Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005).

106.    The June 11, 2018 decision of the Deputy Administrator of CMS is either *ultra vires* or untimely, and was not issued in observance of the procedures required by law, *see* 42 C.F.R. §§ 405.1801(b)(2), 405.1871(b)(1), 405.1875(e)(2), because that decision was issued approximately nine months after the hearing officers' ruling, far beyond the 60-day review

period that would apply if and to the extent that the Deputy Administrator had any authority to review the hearing officers' ruling.

107.    The September 13, 2017 CMS hearing officers' decision, therefore, is the final and binding agency decision for the 2010 and 2011 fiscal years at issue.  *See* 42 C.F.R. §§ 405.1801(b)(2), 405.1871(b)(1), 405.1875(e)(2).

108.    If the Deputy Administrator's decision is procedurally proper and timely, this Court may review that decision and should set it aside because it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," because it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," because it is "without observance of procedure required by law," and because it is "unsupported by substantial evidence" 5 U.S.C. § 706(2).

109.    CMS's determination to remove certain Medicare-covered services from Rocky Mountain's service statistics for apportionment is entitled to no deference, and should be set aside, because it conflicts with the plain language of the controlling regulation in 42 C.F.R. § 417.560(c) and is inconsistent with other indications of the intent of the regulation.  *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *Kaiser Found. Hosps. v. Sebelius*, 708 F.3d 226, 231 (D.C. Cir. 2013) ("Believing the Secretary's interpretation to be inconsistent with her own regulations, we decline the invitation to defer.").  The regulation, related cost report instructions, and agency audit requirements all provide that the numerator of the apportionment ratio includes all Medicare-covered services, without regard to the amount paid by the HMO, and claims processed for payment by Medicare Part B carriers are claims for covered services.  The rules are consistent with other indications of the Secretary's intent when the agency adopted section 417.560, including:  the agency's determination that Rocky Mountain could no longer

continue to apportion costs based on the paid-claims method for cost years after 1985; the agency's approval in 1995 of the apportionment method and statistics that Rocky Mountain used for all fiscal years after 1985; and, the agency's consistent acceptance of Rocky Mountain's cost apportionment calculations, using the CMS-approved method and statistics, for all fiscal years from 1986 through 2005.

110.    The Secretary does not have the authority to apply a new rule retroactively in place of the rules that were in effect during the 2010 and 2011 fiscal years at issue. *See Northeast Hosp. Corp. v. Sebelius*, 657 F.3d 1, 13-14 (D.C. Cir. 2011); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988).  CMS must invoke the notice-and-comment rulemaking procedure mandated by law if the agency wants to change a substantive legal standard governing payment. *See* 42 U.S.C. § 1395hh(a)(1)-(2) & (b); *see also* 5 U.S.C. § 553.

111.    Rocky Mountain did not have notice, with the ascertainable certainty that due process requires, that its service statistics could not include Medicare-covered services for which a claim was processed by a Medicare Part B carrier and for which Rocky Mountain paid a residual amount.  Rocky Mountain reasonably relied on the apportionment regulation and rules in effect during the periods at issue and had no notice, before 2013, of the policy view that CMS applied retroactively in this case. *See Gen. Elec. Co. v. U.S. Envtl. Prot. Agency*, 53 F.3d 1324, 1329 (D.C. Cir. 1995); *Loma Linda Univ. Med. Ctr. v. Sebelius*, 408 Fed. Appx. 383 (D.C. Cir. Dec. 2, 2010) (*per curiam*), *aff'g* 684 F. Supp. 2d 42 (D.D.C. 2010).  An agency decision in adjudication cannot properly be applied retroactively when it substitutes "new law for old law that was reasonably clear," and the new rule would upset "settled expectations" of parties that reasonably relied upon the prior rule. *Pub. Serv. Co. of Colo. v. FERC*, 91 F.3d 1478, 1488 (D.C. Cir. 1996).

112.    The overwhelming weight of the record evidence—all of it undisputed and none of it addressed in the Deputy Administrator's decision—shows that Rocky Mountain's apportionment of costs to the Medicare program and the service statistics used in those apportionment calculations are fair and reasonable.  Undisputed record evidence shows that Rocky Mountain's Medicare apportionment ratios were significantly below the norm, reflecting a conservative apportionment of cost to Medicare.  The undisputed record evidence also shows that costs apportioned to Medicare on Rocky Mountain's cost reports were tens of millions of dollars less than what Medicare would have spent under the Medicare Part B fee for service program or the Part C Medicare Advantage program to provide comparable services to Medicare beneficiaries.  *Cf. St. James Hosp. v. Heckler*, 760 F.2d 1460, 1472 (7th Cir. 1985) (describing the Secretary's professed belief that "the requirement in the law that our costs are not to be borne by others is construed to refer to *total* costs, not to any one cost.") (emphasis in original).

113.    CMS's determination to remove some Medicare-covered services from Rocky Mountain's service statistics distorts the balance of the averaging principle underlying the Medicare cost finding process.  The use of an apportionment statistic is approximate, not precise, and will swing one direction or the other, from year to year and HMO to HMO.  This is entirely appropriate, as long as the rules governing the apportionment statistic are consistently applied. Rocky Mountain's service statistics were consistently applied by Rocky Mountain and are evenly balanced and appropriate because they include all covered services, and all covered services are weighted consistently using a common fee schedule, without regard to actual amounts paid by the plan.  CMS's determination distorts the balance of the apportionment equation by selectively removing some Medicare-covered service statistics from the numerator of the apportionment ratio while leaving all other non-Medicare covered services in the denominator regardless of the

differing amounts paid by Rocky Mountain for those services and including some non-Medicare services for which Rocky Mountain made no payment.  That inconsistency is irrational, arbitrary, and capricious.  *See Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 798-99 (D.C. Cir. 1984) ("[W]here a particular cost might be allocated disproportionately to or from the [Medicare] program, there will be other costs disproportionately allocated in the other direction which will compensate for the first cost."); *St. Mary of Nazareth Hosp. Ctr. v. Schweiker*, 718 F.2d 459, 471 (D.C. Cir. 1983) (so long as the averaging principle is consistently applied across all cases, the end result should be fair as "extreme divergences from the mean balance out."); *Charter Peachford Hosp., Inc. v. Bowen*, 803 F.2d 1541, 1547-48 (11th Cir. 1986) (rejecting arguments by the Secretary "to rely on her regulations and apportionment system when they reduce her reimbursement liability, and to ignore the procedures mandated by her apportionment system when they increase her reimbursement liability.") (quoting *Vista Hill Found., Inc. v. Heckler*, 767 F.2d 556, 565 (9th Cir. 1985)).

114.    The Deputy's Administrator's assertion that the record does not support a claim that CMS "explicitly accepted" Rocky Mountain's apportionment method is irrelevant and unsupported by substantial evidence.  CMS's "explicit acceptance" is irrelevant because the dispositive fact, established by overwhelming and undisputed record evidence, is that *Rocky Mountain* had no notice of the agency's current position that its apportionment statistics could not include all Medicare-covered services.

115.    The Deputy Administrator's assertion as to CMS's "explicit acceptance" also is unsupported by the record evidence, because the undisputed evidence shows that CMS initially approved Rocky Mountain's apportionment method and statistics and then accepted those statistics, without exception, for 20 consecutive cost years and over the course of several full-

scope and on-site audits. The Deputy Administrator's allegation as to CMS's knowledge relies entirely upon hearsay testimony of one current CMS employee who was not employed by the agency before 2006 and who merely testified about what other agency employees allegedly told her. None of those employees were involved in the agency's prior approval of Rocky Mountain's apportionment method and service statistics. They were available to, but not called by, CMS to testify in this case, and the only reasonable inference that can be drawn from CMS's election not to call them to testify is that their testimony would not have supported the agency's position here. *See Int'l Union v. NLRB*, 459 F.2d 1329, 1336 (D.C. Cir. 1972) ("Simply stated, the [adverse inference] rule provides that when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him."); *Interstate Cir., Inc. v. United States*, 306 U.S. 208, 226 (1939) ("The production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse.") (citation omitted).

116.    The cost-shift argument advanced by agency counsel and adopted in the Deputy Administrator's decision irrationally assumes its own conclusion, is unsupported by any record evidence, and was appropriately rejected by the CMS hearing officers. The Medicare Act provides that reasonable cost must be determined under regulations specifying the items included and methods used to make the determination. *See* 42 U.S.C. § 1395x(v)(1)(A). Rocky Mountain's apportionment method and service statistics are consistent with the controlling regulation and were approved by CMS in accord with the rules in effect during the period at issue. CMS's 2014 determination is inconsistent with the apportionment regulation, cost report instructions, and audit requirements that were in effect for the fiscal years at issue, CMS's prior

approval of Rocky Mountain's apportionment method and statistics, and its acceptance of the service statistics used under that method for 20 consecutive cost years before 2006.

117.    The symmetry argument advanced by agency counsel and adopted in the Deputy Administrator's decision is unsupported by any applicable statute or regulation.  As CMS's own witness admitted in the hearing for this case, no Medicare regulation, rule or guidance requires "symmetry" between costs and the service statistics used to apportion those costs.  Asymmetry is necessarily inherent in the use of the service statistics prescribed by the controlling apportionment regulation, because they are specifically intended to measure utilization of services without regard to the actual amount paid by the HMO for any given service.

118.    The double payment argument advanced by agency counsel and adopted in the Deputy Administrator's decision is entirely unsupported by the record evidence.  CMS's own witness admitted that no double payment could result from the use of Rocky Mountain's service statistics because Rocky Mountain's reported costs only include expenses directly incurred by Rocky Mountain and do not include any amount paid on a claim by a Medicare Part B carrier. All of the costs apportioned to Medicare, using Rocky Mountain's service statistics, necessarily were costs incurred by Rocky Mountain.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests an Order:

A.    setting aside and declaring invalid the decision of the Deputy Administrator of CMS, reinstating the decision of the CMS hearing officers, and declaring invalid and setting aside the agency's determinations to remove Medicare-covered services that were initially processed by Medicare Part B carriers from Rocky Mountain's service statistics for the 2010 and 2011 fiscal years at issue;

B.      directing the Secretary to correct Rocky Mountain's service statistics to include all Medicare-covered services for fiscal years at issue, in accordance with the decision of the CMS hearing officers;

C.      directing the Secretary to pay Rocky Mountain the additional amounts due as a result of that correction, plus applicable interest owed on the underpayments made to Rocky Mountain for the fiscal years at issue;

D.      requiring the Secretary to pay legal fees and costs of suit incurred by the Plaintiff; and

E.      providing such other relief as the Court may consider appropriate.


Respectfully submitted,


*/s/ Christopher L. Keough*
Christopher L. Keough
 D.C. Bar No. 436567
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C.  20036-1564
ckeough@akingump.com
(202) 887.4038 (phone)
(202) 887.4288 (fax)

Counsel for Plaintiff


Date:  August 8, 2018